# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WAYNE BING,                    :

                                  :

       Plaintiff,              :       Civil Action No.:    16-2121 (RC)

                                    :

       v.                     :       Re Document No.:    39

                                    :

THE ARCHITECT OF THE CAPITOL,    :

                                    :

       Defendant.          :

## MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Wayne Bing has sued his former employer, the Architect of the Capitol ("AOC"), for racial discrimination, retaliation, and a hostile work environment in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*, and the Congressional Accountability Act ("CAA"), 2 U.S.C. §§ 1301 *et seq.* With discovery complete, the AOC has now moved for summary judgment as to all claims. Because Mr. Bing has put forward evidence from which a jury could reasonably find in his favor on one claim but not on others, the Court will grant the motion in part and deny the motion in part.

## II. BACKGROUND

### A. Factual history

Mr. Bing worked as a Laborer (Recycler) prior to his termination. Def.'s Mot. Summ. J. at 2, ECF No. 39.[1] AOC employees Ronald LeGrand and William Contee supervised Mr. Bing

---

[1] The Court cites to original pagination when it is available. For documents that were not consecutively paginated originally, the Court cites to the ECF page numbers. Facts described are uncontested by the parties, except where explicitly noted.

and eight or nine others working as recyclers alongside him. *Id.* Mr. Bing, his two supervisors, and his fellow Laborers (Recyclers) were all African-American. *Id.*

During his time at the AOC, Mr. Bing was occasionally subject to disciplinary action. In November 2009, he was suspended for being absent without leave, and in January 2012, he was suspended for sleeping on the job and failing to perform his duties in a satisfactory manner. *Id.* at 3. In both instances, Mr. Bing was warned that future misconduct could result in the termination of his employment. *Id.*

A further incident occurred on March 31, 2015, when Mr. Bing interrupted a safety briefing led by Mr. Contee and Mr. LeGrand. *Id.* at 3–4. Specifically, according to an Incident Report dated March 31 and signed by both supervisors on April 2, Mr. Bing "became very disruptive and made outbursts," repeatedly used profanity, and finally walked out of the meeting altogether. *Id.* at 4; *see also* Incident Report (Mar. 31, 2015), Def.'s Mot. Summ. Judg. Attach. ("Def.'s Attach.") (Ex. 9) at 91, ECF No. 39-1.

Around April 29, 2015, Mr. LeGrand sent a memorandum proposing Mr. Bing's termination to Roy Thomas Jr., the Night Building Superintendent, and Robert Washington Jr., the Facility Supervisor, who subsequently proposed termination to Lawrence Barr, the AOC's Deputy Superintendent. Def.'s Mot. Summ. J. at 4. The basis for the recommendation was Mr. Bing's "disruptive behavior." Termination Proposal (Apr. 29, 2015), Def.'s Attach. (Ex. 10) at 94. Specifically, the memorandum stated that, on March 31, 2015, "Mr. Bing displayed disruptive behavior, used inappropriate and offensive language towards his supervision, and refused to follow the directives of a supervisor." *Id.* at 96. For support, the memorandum included the March 31 Incident Report, as well as records of Mr. Bing's disciplinary issues in 2009 and 2012. *See id.* at 97–101.

On June 1, 2015, an Assistant Superintendent, acting on behalf of Mr. Barr, accepted the memorandum's recommendation and initiated the proposed termination. *Id.* The proposal was shared with Mr. Bing around July 8, 2015; as justification for the termination, it again cited his disruptive behavior and his failure to follow the directive of a supervisor on March 31, 2015. *Id.* It also referenced the prior 2012 disciplinary incident. Proposal to Remove (July 8, 2015), Def.'s Attach. (Ex. 12) at 110.

On August 25, 2015, Mr. Bing met with Stephen Ayers, the Architect of the Capitol, to respond to the proposed removal. Def.'s Mot. Summ. J. at 4. At the meeting, Mr. Bing disputed some of the details of the events on March 31, but admitted to becoming angry, saying inappropriate things, and walking out of the safety briefing. *Id.* at 4–5. Mr. Bing also provided a written statement from a colleague, David Mosier, which detailed workplace episodes in which Mr. LeGrand had allegedly been untruthful. *Id.* at 5. Mr. Mosier's statement did not, however, include any mention of the March 31 safety briefing or Mr. Bing's earlier infractions. *Id.*; *see also* Mosier Statement (Aug. 4, 2015), Def.'s Attach. (Ex. 15) at 120. The Superintendent of the Senate Office Buildings, after reviewing the proposed removal and Mr. Bing's response, ultimately decided that removal was appropriate. Def.'s Mot. Summ. J. at 5. On September 4, Mr. Ayers subsequently issued the final decision to remove Mr. Bing, which became effective on September 18, 2015. *Id.* Mr. Bing invoked the AOC's grievance procedures to challenge his removal, but his request was denied. *Id.*

Mr. Bing does not challenge these facts, but highlights some additional ones. First, sometime after the March 31, 2015 incident, Mr. Bing initiated a meeting with Mr. Thomas and another AOC employee, Ms. Joyner, who were questioning Mr. Bing's colleagues about what happened at the safety briefing. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") at 4, ECF

No. 42.  The precise timing of this meeting is somewhat unclear; at his deposition, Mr. Bing could not "recall the exact date," but suggested it was "maybe a month or two after the March incident."  Bing Dep., Def.'s Attach. (Ex. 3) at 38.  At that meeting, after Mr. Bing apologized and expressed remorse for his conduct at the safety briefing, Mr. Thomas told him that the matter could be handled "in house."  Pl.'s Opp'n at 6.  Mr. Bing understood this to mean that no formal discipline would be forthcoming and that the matter was closed.  *Id.*

Second, again at some point after the March 31, 2015 incident, Mr. Bing spoke up at a staff meeting, expressing the view that he, as an African-American male, was not treated as favorably as other employees by the AOC's management.  Pl.'s Opp'n at 4–5.  At his deposition, Mr. Bing was similarly unsure of exactly when this meeting occurred.  At times, he suggested or agreed it took place "a few months" or "a couple of months" after March 31.  Bing Dep., Def.'s Attach. (Ex. 3) at 43, 48–49, 52.  At other points in the deposition, he stated or agreed that it was in "April or May."  *Id.* at 44, 46, 52.  In his briefing here, Mr. Bing takes the position that the meeting took place before Mr. Bing was internally recommended for termination on April 29, 2015.  *See* Pl.'s Opp'n at 5 ("After making this statement [about discrimination] to AOC management, Mr. Bing was internally recommended for termination on April 29, 2015 by Mr. LeGrande [sic] based upon the incidents of March 31, 2015 which had already previously been addressed by Mr. Thomas and Ms. Joyner.").

Finally, Mr. Bing points to two additional Incident Reports, dated July 8, 2015 and July 16, 2015, which, according to Mr. Bing, reflect incidents of misconduct that did not actually occur.  *See* Pl.'s Opp'n at 6.

## B. Procedural history

A few months after his termination, on February 1, 2016, Mr. Bing filed a request for counseling with the AOC's Office of Compliance, alleging both "disparate treatment in the terms and conditions of his employment" and "reprisal/retaliation resulting in a hostile work environment and his termination for having engaged in protected activity." Def.'s Mot. Dismiss Ex. 3 at 1, ECF No. 17-3. Mediation was ultimately unsuccessful, giving Mr. Bing the right to sue in federal court. *See* Compl. at 2, ECF No. 1. He then filed this suit on October 24, 2016, alleging one count of race discrimination and reprisal in violation of Title VII. *Id.* at 3. On January 26, 2017, he filed an amended complaint, now splitting his allegations into one count of race discrimination in violation of Title VII and one count of retaliation in violation of Title VII. Am. Compl. at 7–8, ECF No. 9.

At that point, the AOC moved to dismiss all claims against it arising from acts that occurred before August 5, 2015. *See* Def.'s Memo. Supp. Partial Mot. Dismiss, ECF No. 17. As the AOC argued, the CAA (which extends the protections of Title VII to employees of the legislative branch) requires that employees seeking redress for unlawful discrimination complete a three-step process, which includes a request for counseling "not later than 180 days after the date of the alleged violation." 2 U.S.C. §1402(a). Because Mr. Bing did not request counseling until February 1, 2016, any claims accruing before August 5, 2015 (i.e., 180 days prior) would be untimely, barred by the CAA's jurisdictional provisions. *See Ross v. U.S. Capitol Police*, 195 F. Supp. 3d 180, 199 (D.D.C. 2016).

The Court acknowledged the force of the AOC's jurisdictional argument, but nevertheless denied the partial motion to dismiss. *See* Mem. Op., ECF No. 21. The Court recognized that the "[t]he only act alleged in Mr. Bing's Amended Complaint that occurred

within the filing period is his termination," *id.* at 7, which narrowed the scope of Mr. Bing's potential discrimination and retaliation claims. However, the Court noted that pre-August 5 acts, if sufficiently connected to post-August 5 ones, could support a timely hostile work environment claim. *See id.* at 13–14 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). It therefore denied the motion to dismiss and gave Mr. Bing leave to file an amended complaint setting forth a coherent hostile work environment claim linking the pre- and post-August 5 acts. *Id.* at 14. But the Court also noted that "[i]f Mr. Bing fails to draw this connection, however, he will only be able to use the acts occurring before August 5, 2015 as background evidentiary support for his timely claim of discriminatory or retaliatory termination." *Id.* at 13–14.

Mr. Bing duly filed an amended complaint on December 1, 2017, now alleging both hostile work environment and retaliatory hostile work environment claims in addition to the earlier discrimination and retaliation claims. *See* Second Am. Compl. at 9–12, ECF No. 22. The AOC moved for summary judgment after the close of discovery, and that motion is now ripe for this Court's consideration.

### III. LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable finder of fact to decide in favor of the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). And because the nonmovant's evidence must allow a reasonable jury to find in its favor, "merely colorable" or "not significantly probative" evidence will not preclude summary judgment. *Potter v. District of Columbia*, 558 F.3d 542, 549 (D.C. Cir. 2009).

## IV. ANALYSIS

First, a clarification. Mr. Bing has alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. *See* Second Am. Compl. at 7–12. Although Title VII does not by its own terms apply to the AOC, Title IV of the Congressional Accountability Act of 1995, 2 U.S.C. §§ 1311, 1317(a)(2), extended Title VII's protections to employees of the legislative branch, including the AOC. *See Mayorga v. Merdon*, 928 F.3d 84, 88 (D.C. Cir. 2019). As a result, Title VII and associated case law govern Mr. Bing's claims here. *See Harrison v. Office of Architect of Capitol*, 68 F. Supp. 3d 160, 167 (D.D.C. 2014).

### A. Discrimination and retaliation

Consistent with the Court's earlier ruling on the AOC's motion to dismiss, Mr. Bing's discrimination and retaliation claims are premised on his termination, rather than any other manifestations of prejudice or bias. Specifically, Mr. Bing's basic argument is that the AOC's stated reasons for his firing are pretextual; that is, that he was actually terminated because of his race, for speaking up about discrimination at the staff meeting, or both. *See* Pl.'s Opp'n at 10–12.

1.  Legal framework

As both parties agree, *see* Pl.'s Opp'n at 10–11; Def.'s Mot. Summ. J. at 11–13, these claims of circumstantial discrimination are properly analyzed under the burden-shifting framework originally established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (noting that an employee may allege both discrimination and retaliation based on the same incident and applying the *McDonnell Douglas* framework).

Under *McDonnell Douglas*, in order to establish a prima facie case for a discrimination claim, the plaintiff must show that (1) he or she "is a member of a protected class;" (2) he or she "suffered an adverse employment action;" and (3) "the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)). Likewise, for a retaliation claim, the plaintiff must show that "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

However, when (1) "an employee has suffered an adverse employment action" and (2) "an employer has asserted a legitimate, non-discriminatory reason for the decision," courts "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms, U.S. House of Reps.*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see also Jones*, 557 F.3d at 678 (explaining that *Brady*'s instruction "appl[ies] equally to retaliation claims"). Instead, once the employer has met its burden, the question becomes "whether a reasonable jury could infer intentional discrimination or retaliation from all the evidence, including '(1) the plaintiff's prima facie case; (2) any evidence the

plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).'" *Carter*, 387 F.3d at 878 (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 992–93 (D.C. Cir. 2002)).

## 2. Analysis

In this case, the AOC has offered a legitimate, non-discriminatory, non-retaliatory reason for Mr. Bing's termination: his inappropriate behavior at the March 31 safety briefing and his previous disciplinary infractions. *See* Def.'s Mot. Summ. J. at 13 ("Plaintiff's angry outburst and insubordination on March 31, 2015, violated several AOC standards of conduct and, when combined with his prior disciplinary history, which included two prior suspensions, warranted termination."). These episodes are well-documented in the record and not materially contested by Mr. Bing; indeed, he admits to behaving inappropriately at the meeting. *See* Pl.'s Opp'n at 6 (acknowledging that "Mr. Bing used profanity in the presence of his supervisor Mr. Contee and left a safety briefing prematurely").

Instead, to undermine the AOC's stated rationale, Mr. Bing offers a different narrative, focused on retaliation rather than discrimination. He points out that, shortly after the March 31 safety briefing, he was assured by Mr. Thomas that the fallout from the incident would be handled "in house," without any formal disciplinary action. *See* Pl.'s Opp'n at 11. However, *after* Mr. Bing complained of race-based discrimination at the staff meeting, his employer switched course and recommended him for termination. *See id.* at 12 (referring to the April 29 Termination Proposal). According to Mr. Bing, a reasonable jury could infer from the timing of these events that the AOC changed position in retaliation for Mr. Bing's comments about discrimination. *See id.*

The AOC has a few arguments in reply. It first points out that Mr. Thomas's statement to Mr. Bing is hearsay, unsupported by any witness or documentary evidence. Def.'s Reply Pl.'s Opp'n to Def.'s Mot. Summ. J. (Def.'s Reply) at 2–3, ECF No. 44; *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("'[S]heer hearsay' . . . 'counts for nothing' on summary judgment.") (quoting *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)). But as the AOC allows, Mr. Thomas's statement may well be admissible as a statement of an opposing party. Def.'s Reply at 3; Fed. R. Evid. 801(d)(2). And in this posture, the Court must credit Mr. Bing's version of events and resolve all questions of credibility in his favor.

But of course, Mr. Thomas's assurances are only part of the picture; the crux of the retaliation claim is the staff meeting, when Mr. Bing spoke out against the AOC's discriminatory practices. Here, again, the AOC points to weaknesses in Mr. Bing's evidence for such a meeting. *See* Def.'s Reply at 3 ("[E]ven if the Court were to credit Plaintiff's statements and assume that this constituted protected activity, Bing has no recollection of exactly when this alleged meeting and statement took place—only that it was a couple of months after his outburst and insubordination at the March 31, 2015, staff meeting."). Of course, if the staff meeting indeed took place "a couple of months" after the March 31 incident, Mr. Bing's retaliation claim falls apart: formal procedures for Mr. Bing's termination began at least by April 29, 2015, so, as a matter of logic, they could not have been initiated in retaliation for a protected activity that occurred later. But the timing of the staff meeting is not as clearly established in the record as the AOC suggests (at multiple points in his deposition, Mr. Bing agreed that it may have taken place in "*April* or May"). *See* Bing Dep., Def.'s Attach. (Ex. 3) at 44, 46, 52 (emphasis added). Again, resolving all credibility determinations and drawing all inferences in Mr. Bing's favor, a

factfinder could conclude that the staff meeting took place sometime in April, before the termination process was set in motion.

The question, then, is whether the resulting narrative (insubordination—assurance of non-termination—protected activity—termination) is enough to survive summary judgment. Our Circuit has recently cautioned against inferring retaliation solely on *post hoc ergo propter hoc*, explaining that

> [m]ere temporal proximity is not sufficient to [defeat a proffered non-retaliatory explanation and thereby support a finding of retaliation], because otherwise "protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim." As a result, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations [for the adverse employment action] are genuine."

*Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007)). But here, Mr. Bing has painted a more complex picture: the AOC was content with letting Mr. Bing's insubordination slide *until* he spoke up at the staff meeting. As Mr. Bing argues, this "apparent reversal" arguably raises questions about AOC's true motives and casts doubt on its proffered non-retaliatory explanation. Pl.'s Opp'n at 12. Doctrinally, it represents "positive evidence beyond mere proximity" that distinguishes this case from *Iyoha*. *Cf. Jones*, 557 F.3d at 680–81 (denying summary judgment for employer when employee, in addition to showing temporal proximity, offered evidence discrediting employer's pretextual explanation); *Massaquoi v. D.C.*, 285 F. Supp. 3d 82, 96 (D.D.C. 2018) ("The Court finds that the temporal proximity of the relocation of the plaintiff's workstation, *coupled with his proffer of evidence rebutting the District's explanation for the relocation*, is sufficient to establish pretext and for a reasonable juror to infer retaliation.") (emphasis added). As a result, Mr. Bing's retaliation claim survives.

The same cannot be said of Mr. Bing's discrimination claim. Mr. Bing does not identify any independent evidence of discrimination in the record, like discriminatory statements or attitudes on the part of the employer. *See Carter*, 387 F.3d at 878. Likewise, he does not point to any similarly situated comparators who were treated more favorably than he was. *See* Def.'s Mot. Summ. J. at 13–14; Pl.'s Opp'n at 11. Indeed, in his Opposition, Mr. Bing focuses almost exclusively on his retaliation claim, mentioning discrimination only in passing. *See* Pl.'s Opp'n at 10–12. The Court concludes that no reasonable jury could infer intentional discrimination from the evidence marshalled here.

**B. Hostile Work Environment and Retaliatory Hostile Work Environment**

As described above, Mr. Bing also pleaded two related claims in his Second Amended Complaint: hostile work environment based on race and retaliatory hostile work environment. Second Am. Compl. at 9–12. Both claims are based on an alleged "campaign of administrative harassment" culminating in Mr. Bing's termination. Pl.'s Opp'n at 14.

### 1. Legal framework

Title VII protects employees against hostile and abusive working environments. "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). But Title VII's protections do not set out a "general civility code for the American workplace." *Casey v. Mabus*, 878 F. Supp. 2d 175, 189 (D.D.C. 2012) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

To make out any kind of hostile work environment claim, the conduct must not only be subjectively perceived as abusive, but also be so "severe or pervasive" that it "create[s] an objectively hostile or abusive work environment." *Casey*, 878 F. Supp. 2d at 188 (quoting *Harris*, 510 U.S. at 21); *see also Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 79 (D.D.C. 2013) ("Courts in our circuit typically apply the same legal standard as that used in the discriminatory harassment context to determine whether retaliatory harassment is actionable."). There is no "mathematically precise test," *Harris*, 510 U.S. at 22, for what makes a workplace "so objectively offensive as to alter the 'conditions' of the victim's employment," *Oncale*, 523 U.S. at 81. To determine whether the allegedly discriminatory conduct rises to this level, a court is to analyze the totality of the circumstances. In doing so, a court must "consider the frequency of the harassing conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance." *Stewart v. Evans*, 275 F.3d 1126, 1134–35 (D.C. Cir. 2002) (citing *Harris*, 510 U.S. at 21–23).

In addition, to successfully make out a hostile work environment claim based on race, a plaintiff must show that the alleged "harassment occurred because of the plaintiff's protected status." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 189 (D.D.C. 2012) (citation omitted). In other words, there must be a "'linkage between the hostile behavior and the plaintiff's membership in a protected class' for a hostile work environment claim to proceed." *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 101 (D.D.C. 2011) (quoting *Na'im v. Clinton,* 626 F. Supp. 2d 63, 73 (D.D.C. 2009)). An analogous requirement applies to a retaliatory hostile work environment claim. *See Bergbauer*, 934 F. Supp. 2d at 79 ("Logically, the elements of a retaliatory hostile work environment claim are similar to those of a

discriminatory hostile work environment claim."). Specifically, a plaintiff must show "a causal connection" between the harassment and the protected activity. *Id.*

## 2. Analysis

Mr. Bing argues that "for a period of several months prior to his termination he was subjected to repeated incidents in which his supervisors, whom he ultimately discovered were actively seeking his termination at the time, used Defendant's 'incident report' mechanism to paper Mr. Bing's personnel record with false allegations of poor performance and improper behavior." Pl.'s Opp'n at 14. Specifically, he points to two Incident Reports (filed on July 8, 2015 and July 16, 2015), which he argues were fabricated as part of this campaign of harassment. *See id.* Mr. Bing also highlights "witness testimony regarding Mr. Contee's penchant for falsehood in reporting upon alleged misconduct," *id.* at 15, presumably referring to Mr. Mosier's statement about Mr. LeGrand's untruthfulness, *see* Mosier Statement (August 4, 2015), Def.'s Attach. (Ex. 15) at 120.

As an initial matter, this evidence falls short of indicating the sort of "objectively offensive" conduct required to establish a hostile environment claim. Conceivably, in some contexts, the repeated filing of false disciplinary reports could be sufficiently severe or pervasive so as to alter the conditions of employment. But the two incident reports cited here fail to rise to that level. As far as the record indicates, nothing came of the two reports—they were not cited as justification for any further disciplinary action and did not affect Mr. Bing's pay, grade, or working conditions. *Cf. Turner v. Shinseki*, 824 F. Supp. 2d 99, 124 (D.D.C. 2011) (finding that employer's two warnings to employee regarding his work performance were not sufficient to create a hostile workplace environment).

Even assuming the AOC's conduct here was sufficiently severe or pervasive to create a hostile environment, Mr. Bing has not introduced evidence causally connecting the July reports (or Mr. Contee's penchant for lying) to Mr. Bing's protected status or participation in a protected activity. There is, for example, nothing in the record suggesting that either of the two reports were related to Mr. Bing's race. And with respect to retaliation, there is no basis to infer a causal connection between the reports and Mr. Bing's participation in a protected activity. Mr. Bing received these kinds of write-ups before speaking out at the staff meeting; receiving just two additional written citations, some months after that meeting, does not evidence the sort of accelerated abuse allowing an inference of retaliation. In the absence of more defined causal linkages, Mr. Bing's hostile work environment claims cannot survive summary judgment. *See, e.g.*, *Ward v. District of Columbia*, 950 F. Supp. 2d 9, 19 (D.D.C. 2013) ("[A]lthough the facial neutrality of an action does not necessarily bar a Title VII claim, the plaintiff must at least demonstrate that there is a factual basis for inferring that the incidents were motivated by a retaliatory animus.").

Finally, Mr. Bing has failed to connect the incident reports to his ultimate termination, which raises a timeliness issue. Recall that Mr. Bing was allowed to pursue his hostile work environment claims on the theory that any alleged pre-August 5 acts (like the July reports) would be coherently linked to post-August 5 acts (namely, his firing). *See* Section II.B *supra*. Here, however, Mr. Bing seems to suggest that the false incident reports alone created a hostile work environment, *see* Pl.'s Opp'n at 14–15—a claim which, regardless of its merit, would be time-barred. In any case, it remains unclear what connection the reports had to his ultimate firing, given that the termination process was already well underway by April and at no point referenced any July incidents. This failure to "adequately link[]" the pre- and post-August 5 acts

into a "coherent hostile environment claim" constitutes an independent basis for summary judgment on these claims. *Baird v. Gotbaum (Baird I)*, 662 F.3d 1246, 1251 (D.C. Cir. 2011).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Mr. Bing's retaliation claim can go before a jury; the other three claims cannot. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 30, 2019                                RUDOLPH CONTRERAS
                                                        United States District Judge